O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ORMCO CORPORATION | Case No. SACV 03-16 CAS (ANx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART ORMCO'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT & GRANTING IN PART AND DENYING IN PART ALIGN'S MOTION FOR SUMMARY JUDGMENT AS TO NON-INFRINGEMENT** |
| vs. | |
| ALIGN TECHNOLOGY, INC. | |
| Defendant. | |

## I.    INTRODUCTION

Plaintiff Ormco Corp. ("Ormco") filed the instant action against defendant Align Technology, Inc. ("Align") on January 6, 2003, alleging that Align, via its "Invisalign" process, was infringing three related Ormco patents: (1) U.S. Patent No. 5,447,432 ("the '432 patent"); (2) U.S. Patent No. 5,683,243 ("the '243 patent"); (3) U.S. Patent No. 6,244,861 ("the '861 patent"). Ormco later amended its complaint to allege infringement of a fourth patent, U.S. Patent No. 6,616,444 ("the '444 patent").

On May 13, 2004, the Court granted Align's motion for summary judgment of noninfringement of Ormco's patents. See Ormco Corp. v Align Tech., Inc., 498 F.3d 1307, 1311 (Fed. Cir. 2007), citing Ormco Corp. v. Align Tech., Inc., No. 03-cv-00016 slip. op. (C.D. Cal. May 13, 2004). On August 20, 2004, the Court granted Align's motion for

1
2

summary judgment of nonenablement of Ormco's patents.  See id., citing Ormco Corp. v. Align Tech., Inc., No. 03-cv-00016, slip. op. (C.D. Cal. Aug. 20, 2004).

3
4
5
6
7
8
9

Ormco appealed to the Federal Circuit.  On August 24, 2007, the Federal Circuit affirmed the Court's grant of summary judgment of noninfringement and nonenablement as to claims 1, 9, and 10 of the '432 patent, claims 1 and 2 of the '243 patent, claims 1, 3, 4, 9-12 and 16-18 of the '861 patent, and claims 1-5, 8-36, 41-44, 46-68, and 70-79 of the '444 patent.  Ormco, 498 F.3d at 1320.  However, the court reversed the grant of summary judgment of noninfringement and nonenablement of claims 37-40, 45, and 69 of the '444 patent, and remanded.  Id.

10
11
12

On March 24, 2008, Align moved for a Markman hearing, requesting construction of terms in the remaining '444 patent claims at issue.  On October 3, 2008, this Court issued an order construing the claims.

13
14
15
16
17

On January 16, 2009, Ormco and Align each filed motions for summary judgment on the issue of the validity of the remaining claims in the '444 patent and motions for summary judgment on the issue of infringement.  The parties each filed an opposition in response to the motion for summary judgment on the issue of infringement on January 26, 2009, and each filed a reply on February 2, 2009.

18
19

A hearing was held on February 9, 2009.  After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

20

**II.    BACKGROUND[1]**

21

**A.    The '444 Patent**

22
23
24
25

The '444 patent, which is the only patent at issue herein, is a patent for "a system and method by which an orthodontic appliance is automatically designed and manufactured from digital low jaw and tooth shape data . . ." The '444 Patent, Abstract.  The system involves scanning a model of the patient's mouth to "produce two or three dimensional

26
27
28

[1] All facts are undisputed unless otherwise noted.

2

images and digitizing contours of selected points." Id. The system allows for a computer to be programmed "to calculate finish positions of the teeth, then to design an appliance to move the teeth to the calculated positions." Id.

In its decision overturning the Court's granting of summary judgment for defendant on claims 37-40, 45, and 69 of the '444 patent, the Federal Circuit distinguished these claims from the others on the ground that claims 37-40, 45, and 69 did not relate to "automatic design or automatic calculation of finish tooth positions." Ormco, 498 F.3d at 1317. Instead, the Court held, they relate to "the preliminary gathering and organization of tooth data as an aid to further unspecified orthodontic treatment or for use in creation of a digital model." Id. Because defendant relies on "skilled operators rather than a fully automated computerized process to determine finish positions of the teeth," summary judgment was proper as to those claims that referred to automatic calculation or design but not to the six claims at issue. Id. These six laims 37-are all "method" claims. Align Statement of Uncontroverted Fact ("ASUF") 1; Ormco Statement of Gen. Issues of Material Fact ("OSGI") 1.

### B. The Invisalign Process

Align's "Invisalign" process uses a series of clear plastic "aligners" in lieu of traditional braces to move a patient's teeth into desired positions. The process by which these aligners are created, specifically the creation of a digital 3D model of a patient's teeth, is at issue in this case. Ormco Statement of Undisputed Facts ("OSUF") ¶¶ 11-12; Align Statement of Gen. Issues of Material Fact ("ASGI") ¶¶ 11-12.

The process begins when an orthodontist or other dental technician takes impressions of a patient's teeth, and then submits them along with a prescription and other information about the patient to Align's facility in either Santa Clara, California, or Juarez, Mexico.[2]

---

[2] Ormco disputes whether any of the impressions are sent to and processed at the Mexico facility. OSGI ¶ 2. However, it notes that this dispute does not create an issue of
(continued...)

ASUF ¶ 2; OSGI ¶ 2; OSUF ¶ 13; ASGI ¶ 13.  At the Align facility, Align uses a computer tomography (CT) scanner to scan the impressions in order to produce an image "of a 3D undifferentiated 'mesh' of data," representing the surfaces of teeth and gingiva.  ASUF ¶ 2; OSGI ¶ 2; OSUF ¶ 15; ASGI ¶ 15.  This data is saved as a bite "ADF" file.  ASUF ¶ 2; OSGI ¶ 2; OSUF ¶ 17; ASGI ¶ 17.  The "ADF" file format is a proprietary one developed by Align, and is only readable by Align's proprietary software.  ASUF ¶¶ 3, 5; OSGI ¶¶ 3, 5; OSUF ¶¶ 18, 43; ASGI ¶¶ 18, 43.   The ADF file is saved to both a server in Santa Clara and a server in Costa Rica.  ASUF ¶ 4; OSGI ¶ 4; OSUF ¶ 19; ASGI ¶ 19.[3]

Operations in Costa Rica are performed by Align's wholly-owned subsidiary, Align Technology de Costa Rica, S.R.L.  OSUF ¶ 19; ASGI ¶ 19. Align's officers serve as directors of its Costa Rican subsidiary.  OSUF ¶ 45; ASGI ¶ 45.

Align has developed, primarily in the United States, a software program called "ToothShaper."   ASUF ¶ 12; OSGI ¶ 12.   Align provides a demonstration of the ToothShaper software to operators in Costa Rica.  OSUF ¶ 48; ASGI ¶ 48.  While the master copy of this software remains in Santa Clara, copies of the software are periodically downloaded to the Costa Rica server and installed on the operators' computers.  ASUF ¶¶ 13-15; OSGI ¶¶ 13-15.  When an operator in Costa Rica ("the operator") begins to work on the ADF file, a copy of that data is stored in the RAM of the operator's computer.  ASUF ¶ 8; OSGI ¶ 8. Operators in Costa Rica use the ToothShaper software to create "an accurate representation of the patient's teeth (as opposed to the impression) so that the aligners fit properly."  ASUF ¶ 36; OSGI ¶ 36.  The ADF file generated from the scan of

---

[2](...continued)
material fact, since both parties agree that this step is performed in the United States for at least some patients.  See id.

[3] The parties dispute whether the file is "simultaneously saved" in both locations or only copied to the Costa Rica server later.  See ASUF ¶ 4; OSGI ¶ 4.  The dispute is immaterial to the instant motion, however, as discussed below.

the impression is used for no other purpose than as an input for the ToothShaper process in Costa Rica.  OSUF ¶ 41; ASGI ¶ 41.

After loading the ADF file into ToothShaper, the operator selects two points on each tooth as illustrated in Align's demonstration and ToothShaper uses these locations to generate a facial axis of the clinical crown ("FACC") curve for each tooth. OSUF ¶¶ 47-48; ASGI ¶¶ 47-48.  Based on the undifferentiated mesh from the ADF file, in the "painting crowns step," the ToothShaper software produces an "estimate of the individual tooth boundaries by 'painting' the portion of the unidifferentiated mesh that the computer identifies as belonging to each tooth crown" (Step 15[4]).  ASUF ¶ 19; OSGI ¶ 19.  The operator then corrects any errors the program has made by modifying the coloration of the image (Step 16).  ASUF ¶¶ 20-21; OSGI ¶¶ 20-21.

The software then creates a separate new digital model of each tooth, adds information about the roots and interproximal areas, estimates a 3D coordinate system for each tooth, and modifies the image of the crown so that it can be attached to the newly added roots and interproximal areas (Step 17).  ASUF ¶ 24; OSGI ¶ 24.  The operator then manually modifies the axis for each tooth as necessary (approximately 40-60% of the time), and adjusts the computer-estimated interproximal areas between neighboring teeth (Steps 18, 20).  ASUF ¶¶ 27, 30; OSGI ¶¶ 27, 30; OSUF ¶ 56; OSGI ¶ 56.

In Step 21, the operator then uses a tool in the ToothShaper software to clean up any remaining abnormalities in the scanned image of the patient's teeth, such as those resulting from air bubbles in the impression.  ASUF ¶¶ 34-35; OSGI ¶¶ 34-35.  The gingiva are added in Step 22.  ASUF ¶¶ 38-39; OSGI ¶¶ 38-39.  This completes the development of the 3D image of the patient's teeth in ToothShaper.

The operator then begins using a software program called "Treat."  Using the Treat software, operators "move the individual tooth models to final positions according to the

---

[4] These "Step Numbers" refer to the numbers given in Exhibit B to Ferraro's declaration in support of Align's motion.

doctor's prescription and determine the appropriate movement of teeth for each stage of treatment, so that final positions can be reached after a certain number of stages." (Step 28). ASUF ¶ 41; OSGI ¶ 41.   In Step 29, the operator uses Treat to adjust the paths of each tooth to ensure a "smooth treatment path and tooth velocities and avoid collisions," determining the intermediate staging positions for the teeth.  ASUF ¶¶ 44-45; OSGI ¶¶ 44-45. Similar adjustments are also made to accomodate the gingiva.  ASUF ¶¶ 47-48; OSGI ¶¶ 47-48.   Once this process is complete, the data is saved in a new ADF file and transmitted to Align's Santa Clara facility.  ASUF ¶¶ 45-46, 50; OSGI ¶¶ 45-46, 50; OSUF ¶ 27; ASGI ¶ 27.   The patient's treating orthodontist reviews the case and, if he or she approves it, the post-Treat ADF file is sent to a third party in Juarez Mexico, where it is used to manufacture the aligners.   ASUF ¶ 51; OSGI ¶ 51; OSUF ¶¶ 27-28; ASGI ¶ ¶ 27-28 .

In Mexico, in Step 43, "shelling" software converts the individual tooth models into a single undifferentiated 3D representation for each stage of the alignment process. ASUF ¶¶ 52-53; OSGI ¶¶ 52-53. In Step 50, "slicing" software changes the image of the jaw into a "stair-step representation," which is necessary to make the molds for manufacturing the aligners.  ASUF ¶¶ 56-57; OSGI ¶¶ 56-57.  The shape of the jaw is "puffed out" or enlarged in volume for the manufacturing process (Step 51). ASUF ¶¶ 59-61; OSGI ¶¶ 59-61. A rapid prototyping machine then uses the slice data to create physical molds, slice by slice  (Step 52). ASUF ¶ 63; OSGI ¶ 63.  In step 60, pressure is applied to heated plastic over the physical molds, creating the aligners.  ASUF ¶ 66; OSGI ¶ 66.   The aligners are then trimmed at the gingiva line (Step 61).  Id.; ASUF ¶ 70; OSGI ¶ 70.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of

each cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party has sustained its burden, the nonmoving party must then identify specific facts, drawn from materials on file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested.  See Fed. R. Civ. P. 56(c).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  See also Celotex Corp., 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  See also Abromson v. American Pacific Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

Both parties seek summary judgment as to whether Align is liable on a theory of direct infringement under 35 U.S.C. § 271(a) as to claims 37, 38, 39, 40, and 69, and also whether Align is liable for indirect infringement of claims 37, 40, and 69 under 35 U.S.C. § 271(f).  Align also moves for summary judgment on its liability for literal infringement

of claim 45 and for indirect infringement of all the claims under 35 U.S.C. § 271(g). Ormco also moves for summary judgment as to whether claims 37, 38, 39, 40, and 69 were literally infringed.

As the patentee, Ormco bears the burden of proving infringement of its claims by a preponderance of the evidence. See Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc).

## A.    "Literal" Infringement

In order to establish liability under any theory of infringement, a patentee must first establish infringement that the patented claim reads on the accused process either "literally" or under the doctrine of equivalents. See Allen Engineering Corp. v. Bartell Industries, Inc., 299 F.3d 1336, 1345 (Fed. Cir. 2002). "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." Amhill Enterprises, Ltd. v. Wawa, 81 F.3d 1554, 1564 (Fed. Cir.1996).

In its motion for summary judgment, Align only seeks a determination that claim 45 is not literally infringed. Align Mem. in Supp. of Mot. for Summ. J. ("Align Mem.") at 6. Ormco does not seek summary judgment on the issue of literal infringement of claim 45, but it does on the issue of literal infringement as to all other claims. While Ormco identifies specific facts to support a finding of literal infringement as to claims 37, 40, and 69, Ormco Mot. at 5-6, Align does not oppose the motion as to these claims, and only opposes a finding of literal infringement as to claims 38 and 39. Align Opp'n at 19. Since Align has failed to raise any issue of genuine material fact as to the literal infringement of claims 37, 40, and 69, Ormco's motion for summary judgment of literal infringement as to these claims is granted. The remaining claims are addressed below.

### 1.    Claim 38

Both claims 38 and 39 are dependent of claim 37. Claim 38 is "the method of claim 37 wherein:

1

2

> the producing of the separate digital representations from the generated data includes the operator-interactive selection on a computer display of landmark parameters of individual teeth."

3

The '444 Patent.

4

5

6

7

Ormco argues that the "points selected [by operators in Costa Rica] to create the FACC curve and FA point constitute 'landmark parameters,'" and thus the claim is literally infringed. Ormco Mot. at 17. Align rejects this contention as "conclusory." Align Opp'n at 20.

8

9

10

11

12

13

14

In its October 3, 2008 Order construing the claims, the Court defined "landmark parameters" as "locations on the tooth used to derive attributes of the tooth for modeling tooth movement." It is undisputed that, in the Align process, an Align operator selects two points on each tooth, and ToothShaper uses these locations to generate a facial axis of the clinical crown ("FACC") curve for each tooth. OSUF ¶¶ 47-48; ASGI ¶¶ 47-48. The only question, therefore, is whether the FACC makes use of this data "for modeling tooth movement."

15

16

17

18

19

20

21

22

Align contends that the FACC is not used for modeling tooth movement, but merely is used to "aid in the process of segmenting the teeth," which is necessary to "determine whether the operator should intervene in the ToothShaper's automated determination of the tooth axis." Align Opp'n at 19. Accordingly, Align argues, the locations on the teeth are not used to "model tooth movement" but simply to "create a reference for the software" and to "alert the operator that there may be an error" with the tooth axis the ToothShaper software creates." Id. It is this axis which is used in constructing the actual model of the actual movement of the teeth.

23

24

25

26

27

Align's argument assumes an exceedingly narrow meaning of the term "used to derive attributes for modeling tooth movement," defining landmark parameters as those locations on the tooth that are used *as a basis for constructing* a model of tooth movement. Such a narrow interpretation is inappropriate and not consistent with the plain meaning of the term. If the FACC curve is used solely to prepare a model of teeth that is used to create

28

the model of tooth movement, it is used for the purpose of "modeling tooth movement."

Moreover, the FACC curve is not simply used to "check" for errors in the computer-drawn model.  The FACC is directly used in creating the tooth axis whenever there is an error in the tooth axis created by the ToothShaper software, which occurs 40 - 60% of the time.  OSUF ¶ 56; ASGI ¶ 56. Crueger Decl., Ex. P at 378.  In those cases, according to Align's own documents, in order to manually modify the tooth axes, an operator must use the FACC curve and FA point, derived from the points selected on each tooth.  ASGI ¶¶ 51-54.[5]  In 40-60% of the cases, the FACC is thus directly used to create the model of teeth used to model tooth movement in the Treat system.

Since Align has failed to raise a genuine issue of material fact as to whether claim 38 reads on the Align process,  the Court grants Ormco's motion for summary judgment as to literal infringement of claim 38.

## 2. Claim 39

Claim 39 is "the method of claim 37 wherein:

> the producing of the separate digital representations from the generated data includes representing each of the plurality of teeth by a two-dimensional contour."

The '444 Patent.

Ormco argues that Align infringes this claim by creating the FACC curves using the ToothShaper software. Align points to no factual evidence refuting Ormco's claim that claim 39 has been literally infringed, but solely relies on its argument, rejected by the Court in a separate order, that the expert reports of Drs. Roberts and Hall are inadmissible.

---

[5] In its statement of genuine issue of material fact, Align emphasizes that the FACC curve and FA point are not the *only* information used in determining the axis of each tooth. See, e.g., ASGI ¶¶ 51, 55.  Whether other information is used is irrelevant to the issue of whether claim 38 has been literally infringed.

Ormco relies on Roberts and Hall for their definition of a "two-dimensional contour" as a "line that is all in one plane."[67]  OSUF ¶ 69.  Align does not dispute Ormco's proffered definition.  ASGI ¶ 59.  Align's only dispute, therefore, is with the experts' conclusion that the FACC is a "line that is all in one plane."

Align does not explain its contention that the FACC curve is not a two-dimensional contour.  In an interrogatory response, Align stated that the FACC curve is "3D" or three-dimensional.  OSUF ¶ 61; ASGI ¶ 61; Crueger Decl., Ex. M at 191.  However, Align does not dispute that it has cited no evidence to support this contention.  ASGI ¶ 61.  Since Align thus fails to "point to some facts in the record that demonstrate a genuine issue of material fact," Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir.2000), Ormco's motion for summary judgment as to literal infringement of claim 39 is granted.

### 3.    Claim 45

Claim 45 entails "scanning the shapes of the teeth of a patient directly from the mouth of the patient and generating data thereof."  The '444 Patent.  Align seeks summary judgment that it does not literally infringe claim 45, arguing that there is no evidence that it itself scans any patient's teeth directly from the mouth of the patient.  Align Mem. at 6.

To find "literal infringement," the Court need not find that Align itself performed every process in the claim-at-issue.  The question is whether the Invisalign process as

---

[6] Neither party sought construction of the term at the Markman hearing, and Align does not offer a competing construction, nor does it seek construction now.  As such, the parties have "implicitly conceded that the meanings of the term[] [is] clear and not in need of construction."  Eli Lilly and Co. v. Aradigm Corp., 376 F.3d 1352, 1360 (Fed. Cir. 2004) (citing U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

[7] The experts further provided that "Three points along a curved surface that are non-identical and non-collinear define a plane which is a two-dimensional object by definition." OSUF ¶ 60. Align does not dispute this fact. ASGI ¶ 60.

a whole contains every limitation recited in the claim.  If some steps are performed by different parties, Align may still be liable under a theory of "joint infringement."  See Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1329 (Fed. Cir. 2008).

Under such a theory of liability, Ormco argues that a genuine issue of material fact exists as to whether Align collaborates with third parties who themselves directly scan patient's teeth, particularly in the research and development process.  Specifically, Ormco points to communications by Align officials and employees discussing their work with scanner manufacturers, Burkland Decl., Ex. 5 at 12, Ex. 6 at 23, and Ex. 7 at 26, and an Align presentation showing data obtained from two orthodontists, Burkland Decl., Ex. 15 at 64-72.   Ormco also argues that Align has failed to fully comply with its discovery requests, withheld further information about its research and development process, and acted unreasonably in the production of witnesses.  Ormco Opp'n at 19-20.  As such, Ormco asks the Court to deny Align's motion for summary judgment as to Claim 45 under Rule 56(f).[8]

In its reply, Align argues that Ormco has failed to meet its burden to show the scans at issue were performed under the "direction" or "control" of Align, as required to establish joint infringement.  See Muniauction, 532 F.3d at 1329.  As the nonmoving party, however, Ormco merely has to establish that there is a genuine issue of material fact as to whether Align's collaborators were acting under its direction or control.  Ormco's identification of specific orthodontists who have provided Align with data from direct scans of patients teeth, as well as the communications about Align's work with scanner manufacturers to develop more efficient scanning techniques, are sufficient to meet its burden.

---

[8]  Under Rule 56(f), "summary judgment should not be granted while an opposing party timely seeks discovery of potentially favorable information."  California Dep't of Social Services v. Leavitt, 523 F.3d 1025, 1034 (9th Cir. 2008).

12

As such, the Court denies Align's motion for summary judgment as to literal infringement of claim 45.

## B.    Direct Infringement Under 35 U.S.C. § 271(a)

Under 35 U.S.C. § 271(a):

> whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

The use of a process only constitutes infringement of a patented claim if "all steps or stages of the claimed process" are performed in the United States. NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1318 (Fed. Cir. 2005). Ormco does not argue that the commercial application of the Invisalign process constitutes such literal infringement, nor can it, since it is undisputed that not "all" of the steps of the claimed process are performed in the United States. Significant portions of the process are performed in Costa Rica, as noted above. Accordingly, Align is entitled to summary judgment as to Ormco's allegations of direct infringement as related to its commercial process.

Ormco, however, argues that Align does perform all of the steps of the claimed processes within the United States when it conducts "clinical studies, engineering studies, and software development" (collectively referred to as Align's "research and development activities"). Ormco Mot. at 7; Ormco Opp'n at 1-2.

Use of a patented process during research and development may constitute infringement. "There is no fair use or research and development exception for infringement of normal commercial processes." Soitec, S.A. v. Silicon Genesis Corp., 81 Fed. App'x 734, 737 (Fed. Cir. 2003), citing Madey v. Duke Univ., 307 F.3d 1351, 1362 (Fed. Cir. 2002). To meet its burden of proof, however, Ormco must "either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." Lucent Technologies, Inc. v. Gateway, Inc., 543 F.3d 710,

13

723 (Fed. Cir. 2008), quoting ACCO Brands, Inc. v. ABA Locks Manufacturer Co., 501 F.3d 1307, 1313 (Fed. Cir. 2007). Here, any specific instance must have occurred after September 9, 2003, the date on which the '444 patent was issued.

Ormco relies on the deposition testimony of Align witness Ian Kitching in support of its claim of direct infringement by Align in its research and development activities.[9] First, Ormco argues this testimony shows Align uses ToothShaper in the United States for clinical studies. The only facts that support this contention come from deposition testimony about the use of ToothShaper in clinical studies, by an individual who admitted he himself did not conduct any clinical studies. Crueger Decl., Ex. G at 54:19-55:6; 58:5-61:3. Align responds by pointing to testimony that shows that Align does not "do any clinical cases in the United States." Kim Decl., Ex. 2 at 55:8-13. Since there is no testimony about the difference between "clinical cases" and "clinical studies," this evidence  is not sufficiently clear to allow the Court to conclude as a matter of undisputed fact that all of the steps of the patented claims were or were not performed in the United States. Second, Align points to Kitching's testimony that Align employee's "test the software with a number of test cases." Crueger Decl., Ex. G at 60:11-60:13. Align responds by contending that there is no evidence these "test files" were scanned and generated after the issuance of the '444 patent. Align Resp. to OSUF 1. Since no evidence suggests otherwise, this raises a genuine issue of material fact.

In light of the factual dispute over the use of ToothShaper within the United

---

[9] Ormco also argues that, since it is undisputed that Align developed ToothShaper "primarily in the United States," Align could not have done so without infringing the asserted claims. Ormco Opp'n at 2. The use of the word "primarily," however, prevents the Court from finding that *all* of the steps of the claimed processes were performed in the United States. Moreover, circumstantial evidence is insufficient to meet a patentee's burden of demonstrating direct infringement. See Lucent, 542 F.3d at 723.

14

States, both parties' motions for summary judgment as to Align's infringement under §271(a) via its research and development are denied.

In its own motion for summary judgment, Ormco also argues that Align "is liable under § 271(a) under a joint infringement theory when it performs one step of the claims and directs it [sic] Costa Rican subsidiary to perform the remaining steps on its behalf." Ormco Mot. at 7, 14-15.  Theories of joint infringement are cognizable under § 271(a) where multiple actors are involved, and the patentee can show that one party "control[s] or direct[s] each step of the patented process," even if some steps are "performed" by others.  BMC Resources, Inc. v. Paymentech, L.P., 498 F.3d 1373, 1380 (Fed. Cir. 2007), rehear'g en banc denied (2008).  However, the "joint" aspect does not eliminate the need to show all steps or stages of the claimed process are performed in the United States.  The theory of joint infringement concerns who performed the steps of a claim, not where the steps were performed.  Accordingly, Ormco's motion for summary judgment on this theory is denied.

## C. **Indirect Infringement under 35 U.S.C. § 271(f)**

35 U.S.C. § 271(f) creates liability for anyone who "supplies or causes to be supplied in or from the United States" one or more components of a patented invention "where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."   Infringement can be established via showing either  "all or a substantial portion of the components of a patented invention" were supplied, 35 U.S.C.§ 271(f)(1) or "any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use" was supplied, 35 U.S.C.§ 271(f)(2).

1
2
3

Ormco argues that Align's commercial process infringes the claims of the '444 patent under § 271(f)(1) and § 271(f)(2).  Align responds that, as a matter of law, neither provision of § 271(f) can be applied to its process for several reasons.

4

### 1.     The General Applicability of § 271(f) to Method Claims

5
6
7
8
9
10
11
12
13
14
15
16

The parties dispute whether 35 U.S.C. § 271(f) applies to method claims. Align points to dicta in Microsoft Corp v. AT & T Corp., 550 U.S. 437, 127 S. Ct. 1746 (2007), which did not concern a method claim, as leaving the question "expressly unresolved."  There, the Court commented, "If an intangible method or process, for instance, qualifies as a 'patented invention' under § 271(f) (a question as to which we express no opinion), the combinable components of that invention might be intangible as well." 127 S. Ct. at 1756, n. 13.  However, in a recent unpublished opinion, the Federal Circuit held that Microsoft did not "overturn[] this court's prior precedents that have held that § 271(f) applies to method claims," namely, Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366 (Fed. Cir. 2005).  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., Nos. 2007-1296, 2007-1347, 2008 WL 5257333, at *8 (Fed. Cir. Dec. 18, 2008).[10]

17
18
19
20

While Cardiac Pacemakers is nonprecedential, the Court finds it persuasive, and declines to read Microsoft's dicta as overruling Union Carbide's clear holding.[11]   In Union Carbide, the patentee of a process for the production of ethylene oxide brought a § 271(f) infringement claim.  In rejecting the alleged infringer's claim that § 271(f) "is

21
22
23
24

[10]     At the hearing, Align asked the Court to take judicial notice of a petition for rehearing en banc filed with the Federal Circuit on January 21, 2008.  In light of that filing, the Court's ruling on this issue is made without prejudice to the instant motions being renewed as to the § 271(f) issues should the Federal Circuit issue an order inconsistent with the panel's initial decision.

25
26
27

[11]     Align argues that Cardiac Pacemakers confirms that the question remains an open one.  Align Opp'n at 12-13. The Court disagrees; Cardiac Pacemakers makes clear that Union Carbide remains the law until an en banc Federal Circuit or the Supreme Court says otherwise.

28

not directed to process claims," the Federal Circuit held that § 271(f) "makes no distinction between patentable method/process inventions and other forms of patentable inventions."  425 F.3d at 1378-79, <u>citing</u> <u>Eolas Techs. v. Microsoft Corp.</u>, 399 F.3d 1325, 1338-39 (Fed. Cir. 2005).

Align argues that the holding of <u>Union Carbide</u> is in tension with an earlier Federal Circuit case, <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 418 F.3d 1282 (Fed. Cir. 2005).  In <u>NTP</u>, the court considered a claim under § 271(f) that the sale of BlackBerry handheld devices to customers in the United States, who would then take the devices with them and use them while traveling abroad, constituted the supply of "components of a patented invention," there, a relay system. 418 F.3d at 1322.  The court held:

> While it is difficult to conceive of how one might supply or cause to be supplied all or a substantial portion of the steps of a patented method in the sense contemplated by the phrase "components of a patented invention" in section 271(f), it is clear that RIM's supply of the BlackBerry handheld devices and Redirector products to its customers in the United States is not the statutory "supply" of any "component" steps for combination into NTP's patented methods.

<u>Id.</u>

The <u>Union Carbide</u> court explicitly differentiated <u>NTP</u>, noting that there, the only use abroad occurred when American BlackBerry users traveled abroad and took their devices with them.  Thus, the alleged infringer "itself did not supply any component to a foreign affiliate."   425 F.3d at 1380.  Accordingly, the statutory definition of infringement was not met, regardless of whether the claim was a method one or not.  In <u>Union Carbide</u>, though, "[b]ecause [the alleged infringer] supplie[d] catalysts from the United States directly to foreign customers . . . [the Federal Circuit] d[id] not face another situation involving the domestic sale of a component being used, in part, outside the United States."  <u>Id.</u>

<u>Union Carbide</u> simply stands for the proposition that § 271(f) *can* be applied to method claims, a proposition not foreclosed by <u>NTP</u>.  It does not mean all § 271(f) method infringement claims will succeed.  To prevail, a patentee must still be able to

17

show that the alleged infringer meets the statutory criteria: (1) the infringer supplied or caused to be supplied in or from the United States; (2) one or more components of a patented invention "where such components are uncombined in whole or in part"; (3) in a way as to "actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."   The patentee must also show (4) either "all or a substantial part" of the components were involved, § 271(f)(1), or that a single component involved was "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use," § 271(f)(2).

### 2.   Is a "component of a patented invention" sent to Costa Rica?

Ormco argues that both the ADF file and the ToothShaper software are "components" of its patented method that Align supplies to its Costa Rican subsidiary. Ormco Mot. at 12-13.   Align argues that, as a matter of law, ADF files cannot be "components" as they are not "tangible objects."  Align Mem. at 8; Align Opp'n at 14. Align also argues that Ormco's claim that the ToothShaper software is a component is baseless.  Align Opp'n at 15.

### a.   The ToothShaper software

In <u>Microsoft</u>, the Supreme Court explicitly addressed the question of "when, or in what form, does software qualify as a 'component' under § 271(f)?"  The Court held that "software, uncoupled from a medium" is not "a combinable component."  127 S.C t. at 1755.   However, it held that copies of software could qualify as a "component" under § 271(f).  <u>Id.</u> at 1756.

A copy of the ToothShaper software is provided by Align to its Costa Rican affiliate.   That that copy is distributed electronically rather than on a CD-ROM is immaterial.   The <u>Microsoft</u> court specifically contrasted computer source code, which cannot be a component, with software that "can be inserted into a CD-ROM drive or

18

downloaded from the Internet," which can be. 127 S. Ct. at 1755. Therefore, the fact that the copy of ToothShaper is transmitted electronically and is "intangible" in the sense it cannot be touched is irrelevant.[12]  However, just because software can be a component does not mean that it is a component of the patented method at issue.

In Microsoft, the Supreme Court relied on a dictionary definition of the term "component," noting that "'[c]omponent' is commonly defined as 'a constituent part,' 'element,' or 'ingredient.'" 127 S. Ct. at 1755, n. 11, citing Webster's Third New International Dictionary of the English Language 466 (1981). The software source code at issue in Microsoft, when installed on a computer, allowed the computer "to process speech in the manner claimed by that patent." 127 S. Ct. at 1750. In determining when software can be a component, the Microsoft court discussed how source code is like a "blueprint." 127 S. Ct. at 1755. "A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device." Id. The Court held the software was thus not a component, since it merely provided "instructions" to a target computer how to act.

The ToothShaper software is not a "part" of the patented method; rather, it is a tool used in performing the steps of the method. The Supreme Court explicitly held that such tools are not considered components under § 271(f) in Microsoft. 127 S. Ct. at 1756 ("Congress, of course, might have included within § 271(f)'s compass, for example, not only combinable 'components' of a patented invention, but also 'information, instructions, or tools from which those components readily may be generated.' It did not."). Accordingly, because the ToothShaper software is not a "component" of the patented method as that term is used in the statute, the Court grants

---

[12] The Court specifically refused to "address whether software in the abstract, or any other intangible, can ever be a component under § 271(f)." 127 at 1756 n. 13.

Align's motion for summary judgment as to Ormco's § 271(f) claims based on Align's

supply of the ToothShaper software to its Costa Rican subsidiary.

### b.    The ADF File

As with the ToothShaper software, any argument that the ADF file is "intangible"

and thus cannot be a component fails.  Not only would it be inappropriate to find that

Align could avoid liability because it "uploaded" the file, rather than sending it to Costa

Rica via CD-ROM, but it is also contradicted by the text of Microsoft.  See 127 S. Ct.

at 1755 (discussed above).

Unlike the ToothShaper program, the ADF file is not "software."  See Microsoft,

127 S. Ct. at 1754 (defining software as "the set of instructions, known as code, that

directs a computer to perform specified functions or operations") (quoting Fantasy

Sports Properties, Inc. v. Sportsline.com, Inc., 287 F.3d 1108, 1118 (Fed. Cir. 2002)).

Rather, it is electronic data, used as an input and read by the ToothShaper software.

See, e.g., Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1339 (Fed. Cir. 2001)

(discussing how "software scans a digital data file"); CNET Networks, Inc. v. Etilize,

Inc., 528 F. Supp.2d 985, 988 (N.D. Cal. 2007) (discussing software application's use

of data file); Liberty Am. Ins. Group, Inc. v. WestPoint Underwriters, L.L.C., 199 F.

Supp.2d 1271, 1278 (M.D. Fla. 2001) (distinguishing between data file and software).

A data file like the ADF file does not merely instruct Align's Costa Rican

subsidiary how to act in a manner that infringes on its patented claims.  Rather, it is

information that is incorporated into other steps of the patented claims, without which

the patented claim cannot fully be completed.[13]  It is the sole source of information

---

[13]  In light of these findings, the Court declines to consider the question of whether
the Federal Circuit's holding in Eolas Techs. v. Microsoft Corp., 399 F.3d 1325, 1339
(Fed. Cir. 2005), that a "step" in a claimed method itself will always constitute a
"component," remains good law after Microsoft Corp. v. AT & T Corp.. See Ormco Mot.
at 13; Ormco Opp'n at 4.

about a patient's teeth, not a generalized set of steps.[14]  Unlike a blueprint or "template," it is more like an "ingredient" in a recipe than the recipe card itself.[15]

Under the plain meaning definition of the term "component" adopted by the Court in Microsoft, the Court finds that the ADF file is a component of the patented claims at issue.

### 3.    Is the ADF File  "Supplied in or From the United States"?

Align argues that in sending the ADF file to Costa Rica, it does not "supply a component from the United States" because it is a "copy" and not the original file. Align Mem. at 9; Align Opp'n at 16-17.  Align bases this argument on a misreading of Microsoft.  There, the Court held that the supply of a master disk containing source code was not the supply of a component, since the source code was copied from the master disk and these copies were later installed onto other foreign computers.  The Supreme Court held that "replication abroad of a master dispatched from the United States" failed to meet the "supplied from the United States" requirement.  Here, Align itself provides the copy of the original ADF file to the Costa Rican computer server,[16]

---

[14] Align's argument that the fact that not all of the scan data in the ADF file is incorporated into later steps means it is not a "component," Align Opp'n at 15,  is unpersuasive.  There is no requirement that all of a "component" be integrated into later steps; whether it was "combined" is a separate issue, addressed below.

[15] Align also argues that the fact that the ADF file is only readable with Align's proprietary means it is not "amenable to combination."  Align Mem. at 9.  It provides no case law to support its contention that § 271(f) requires a component to be universally amenable to combination.  The ADF file is amenable to combination in Align's process, and it is that process which is at issue in this action.

[16] Ormco disputes that this file is a "copy," and rather argues the file is "simultaneously saved" in both locations.  See OSGI ¶ 4.  Under either scenario, the Court reaches the same conclusion.

21

and this copy is used by the individual computer running the ToothShaper program.[17] If Align supplied a copy of the file to Costa Rica, it is irrelevant what Align did with the original. Therefore Align fails to establish a genuine question of material fact as to whether Align supplied a component from the United States.

### 4.    Is the ADF File "Combined" With Other Elements?

Align contends that the ADF file is never "combined with the ToothShaper software," and thus cannot be the basis for a § 271(f) violation.  Align Opp'n at 16.

While the Federal Circuit has held that, "At no point does the statutory language require or suggest that the infringer must actually combine or assemble the components," Waymark Corp. v. Porta Systems Corp., 245 F.3d 1364, 1368 (Fed. Cir. 2001), no court has examined what "combine" means in terms of the combination requirement.  Moreover, the text of § 271(f) does not specify with what the supplied component must be "combined."

As the Supreme Court noted in Microsoft, "[w]e construe § 271(f)'s terms 'in accordance with their ordinary or natural meaning.'" 127 S. Ct. at 1755, quoting FDIC v. Meyer, 510 U.S. 471, 476 (1994).  A combination is defined as "a union of elements that may be partly old and partly new."  Black's Law Dictionary 260 (1999).  While Align suggests that a combination requires that elements be "joined in physical or chemical union," Align Reply at 7, it cites no support for this proposition.  Rather, the term combination "encompasses not only a combination of mechanical elements but

---

[17] Align further argues that the fact that individual computers store another copy of this file in their RAM precludes a finding that Align "supplied" a component.  Under this theory, no software could ever be a component.  "Courts that have addressed the issue agree that the loading of software from some permanent storage medium, such as a floppy disk or a computer's hard drive, to the computer's random access memory ("RAM") when the software is 'booted up' causes a copy to be made."  Stenograph L.L.C. v. Bossard Associates, Inc., 144 F.3d 96, 101 (D.C. Cir. 1997).  Microsoft's holding as to the duplication of a master disk presents an entirely different situation to the technical "copying" that occurs whenever a program is loaded.

also a combination of substances in a composition claim or steps in a process claim."[18] Black's Law Dictionary 260 (1999). Since § 271(f)(2) explicitly provides for liability when only one component of a patented invention is supplied, the combination requirement cannot be read as requiring two supplied components to be combined

There is no requirement that the ADF file be "physically joined" with the ToothShaper software. Rather, it must only be combined with other elements of the patented claims. It is undisputed that the ADF file is combined with other steps in the Align process by computer operators in Costa Rica, and thus there is no genuine issue of material fact as to the presence of this element.

### 5. Is the ADF File a "substantial part" of the components?

Section 271(f)(1) provides for liability when a party supplies or causes to supply "all or a substantial portion of the components, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States . . . ." Ormco does not contend that the ADF file represents "all" of the components of the patented process, but it argues that the ADF file represents a "substantial" part of the components. Ormco Mot. at 14.

Ormco conclusorily argues that the ADF file "is, at the very least, a substantial portion of the patented inventions." Ormco Mot. at 14. To determine whether a genuine issue of fact exists as to this issue whether the ADF file is a "substantial portion" of the components of the invention, the Court must first determine the meaning of that term as used in the statute, particularly whether a "substantial portion" can ever be comprised of one component.

Few courts have explicitly addressed this issue, but those that have done so have generally found that more than one component must be supplied for there to be liability

---

[18] This definition squarely contradicts Align's repeated assertion that a step cannot be "combined." See, e.g., Align Reply at 6-7.

under § 271(f)(1).  Looking to the statutory text in Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95 CIV 8833, 2001 WL 1263299, at *4 (S.D.N.Y. Oct. 19, 2001), one district court explained:

> The plain meaning of Section 271(f)(1) is that it only applies where multiple components have been supplied or caused to be supplied in or from the United States.  The statute repeatedly refers to "components" in the plural. In addition, the statute's use of the term "such components" refers back to the supply of "all or a substantial portion of the components."  One cannot actively induce the combination of "such components" outside the United States where there is only one "such" component supplied in or from the United States.

(footnote omitted).  See also Fieldturf, Inc. v. Southwest Recreational Industries, Inc., 235 F.Supp.2d 708, 733 (E.D. Ky. 2002) (noting "the Court cannot find that the plain meaning of § 271(f)(1) yields liability for infringement where only one component of four comprising the patent is supplied from within the United States"), vacated on other grounds by 356 F.3d 1266 (Fed. Cir. 2004).

The meaning of § 271(f)(1) is further informed by § 271(f)(2).  In discussing the two provisions in Microsoft, the Supreme Court differentiated § 271(f)(2) from § 271(f)(1) by noting the former applied to "the export of *even a single component* if it is 'especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use.'" 127 S. Ct. at 1760 n.18 (emphasis added).  This reading suggests that while both § 271(f)(1) and § 271(f)(2) may apply where one party supplies less than all of a patented invention's components abroad, only § 271(f)(2) can apply where only one component is supplied.

In light of the plain text of § 271(f)(1) and § 271(f)(2) and the reasoning of other courts, the Court finds that § 271(f)(1) cannot, as a matter of law, apply when only one component is "supplied" abroad.  Accordingly, the Court grants Align's motion for summary judgment of non-infringement and denies Ormco's motion for summary judgment of infringement as to Ormco's § 271(f)(1) claim.

### 6.   Is the ADF File a Staple Article or Commodity of Commerce Having a Substantial Noninfringing Use?

To establish liability under § 271(f)(2), the supplied component(s) must be "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use." The parties do not dispute that the ADF file is especially made or adapted for use in the process-at-issue. They do dispute, though, whether any substantial noninfringing uses exist, and what standard the court should apply in determining whether such uses exist.

In light of the sparse case law interpreting this provision of § 271(f), the Court looks to case law interpreting this phrase as used in 35 U.S.C. § 271(c) based on the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." Agro Dutch Industries Ltd. v. United States, 508 F.3d 1024, 1032 (Fed. Cir. 2007), quoting Gustafson v. Alloyd Co., 513 U.S. 561, 568 (1995). See also Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co., 434 F.3d 1357, 1358 (Fed. Cir. 2006) (Lourie, J., dissenting from denial of reh'g in banc) (looking to § 271(c) in interpreting § 271(f)); Veritas Operating Corp. v. Microsoft Corp., 562 F. Supp.2d 1141, 1272-73 (W.D. Wash. 2008) (noting parallel provisions in § 271(c) and § 271(f)).

The Federal Circuit recently discussed this parallel "substantial noninfringing use" exception in Ricoh Co., Ltd. v. Quanta Computer Inc., 550 F.3d 1325, 1338-40 (Fed. Cir. 2008). Discussing the Supreme Court's decision in Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005), a copyright case, the court noted that:

> the "purpose of the "substantial noninfringing use" exception of § 271(c) is to allow determination of instances where the intent to infringe may be presumed based on the distribution of a product that has an unlawful use. When a manufacturer includes in its product a component that can only infringe, the inference that infringement is intended is unavoidable."

550 F.3d at 1338 (internal citations omitted).  The "substantial noninfringing use" inquiry in § 271(f), therefore, exists as a means for an alleged infringer to rebut the presumption that its export of components of the patented process was done to encourage infringing conduct abroad.

The first dispute is whether a reviewing court is to consider potential noninfringing uses of the ADF file specifically or "undifferentiated tooth data from a 3D scan" in general.  Ormco argues for the former, Ormco Opp'n at 9, and Align argues for the latter, Align Opp'n at 18.  In Ricoh, the Federal Circuit reaffirmed its holding in Hodosh v. Block Drug Co., 833 F.2d 1575 (Fed. Cir. 1987), which held that, as to potential substantial noninfringing uses, "the focus of the § 271(c) inquiry should be on the [product at issue] as 'what was actually sold,'" not as to an individual ingredient of the product.  550 F.3d at 1339.  See also Lucent Technologies, Inc. v. Gateway, Inc., 580 F. Supp.2d 1016, 1038 (S.D. Cal. 2008) (discussing Hodosh and "the thing sold" requirement of 271(c));  Veritas Operating Corp. v. Microsoft Corp., 562 F. Supp.2d 1141, 1169 (W.D. Wash. 2008) (same).

In this case, "the thing sold," although it is not clear if any money exchanged hands, was an ADF file, not some generic bundle of undifferentiated tooth data.  Therefore, the Court must examine whether there are any substantial noninfringing uses for ADF files, specifically.

In doing so, the parties debate whether the court is to consider the realm of all conceivable uses for the component, see Align Mem. at 10; Align Opp'n at 18, or simply the intended uses of the component.  Under § 271(c), the Federal Circuit has held that in order to take advantage of the "substantial noninfringing use" exception, an alleged infringer must show both that "the device at issue, in theory, could be used in a way so as not to infringe the asserted method claim" and "that the device was actually used in the non-infringing way."  Golden Blount, Inc. v. Robert H. Peterson Co., 438

F.3d 1354, 1363 (Fed. Cir. 2006), citing C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 911 F.2d 670, 674-75 (Fed. Cir. 1990).

Align points to expert testimony as to other possible uses for undifferentiated data from a scan of multiple teeth. Rekow Decl. in Supp. of Align Opp'n 10-12; Kim Decl. ¶ 2, Ex. 1 at 27:12-28:12. However, it has not provided any evidence showing that anyone has used any ADF file in anything other than the Align process at issue. Therefore, Align cannot meet the Golden Blount standard.

The Court finds no genuine issue of material fact exists as to whether the ADF file is a component supplied by Align from the United States and combined with other elements in a way that "would infringe the patent if such combination occurred within the United States." The Court also finds no relevant factual dispute to show that the ADF file qualifies for § 271(f)(2)'s "substantial noninfringing use" exception. Accordingly, Ormco's motion for summary judgment of infringement under § 271(f)(2) is granted, and Align's motion for summary judgment of noninfringement under § 271(f)(2) is denied.

## C.   Indirect Infringement under 35 U.S.C. § 271(g)

In contrast to 35 U.S.C. § 271(f), § 271(g) creates infringement liability for anyone who "without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States." There is no liability, however, when the product made by the patented process is "materially changed by subsequent processes" or "becomes a trivial and nonessential component of another product." § 271(g)(1)-(2).

Align argues this provision is inapplicable as a matter of law, as the "painted crowns" are not a "product made by a patented process." Align Mem. at 11. Ormco, responds that it is not alleging infringement on the basis of the importation of "painted crowns," but rather for the importation of the post-Treat 3D digital model sent from

27

Costa Rica back to Align's Santa Clara headquarters.   Ormco Opp'n at 11-12.
Accordingly, the Court construes the claim as framed by Ormco, the nonmoving party.

To determine whether Ormco can establish infringement under § 271(g), the
Court must determine whether the 3D digital model is (1) a "product made by a process
patented in the United States" and (2) whether it falls under either the "material change"
or "trivial and nonessential component" exceptions.

### 1.   Is the 3D Digital Model a "Product Made"?

In determining whether the 3D digital model can be considered a "product made"
under § 271(g), the Court looks to Bayer AG v. Housey Pharmaceuticals, Inc., 340 F.3d
1367 (Fed. Cir. 2003).  There, the Federal Circuit held "that in order for a product to
have been 'made by a process patented in the United States' it must have been a
physical article that was 'manufactured' and that the production of information is not
covered." 340 F.3d at 1377.

While the 3D digital model at use here is not tangible, and is contained as a data
file, it is not clear that it falls under the category of "information" as referenced by the
Federal Circuit.  In Bayer, the court held that "research data or information obtained
from using the patented methods" could not provide the basis for a § 271(g) claim.  340
F.3d at 1370 (alteration omitted).  It does not necessarily follow that anything contained
in electronic format will not be a "product made" by patented methods.

In CNET Networks, Inc. v. Etilize, Inc., 528 F. Supp.2d 985 (N.D. Cal. 2007),
instructive, the court found that an electronic catalog produced by a patented process
was a "product" under § 271(g).  In doing so, it noted that the catalog was "an object
that is present in the United States because the file is downloaded onto the local hard
drives of computers owned by customers in the United States." 527 F. Supp.2d at 994.
Distinguishing Bayer, the Court focused on two primary differences.  First, "while
practicing each step of the research method in Bayer did not lead to the creation of a
drug, practicing each step of the method in this case leads directly to the creation of a

catalog."  Second, applying Microsoft, the Court found that the catalog- once "stored on computer readable media"- " far from being abstract information or knowledge, [was] a physical article no different from a product catalog manufactured and assembled on paper bound with stitching, glue or staples."  527 F. Supp.2d at 994.

The same logic applies to the 3D digital model in this case.  Like the catalog in CNET Networks, the 3D digital model is not a mere package of information, but a "creation" produced by "practicing each step" of a patented process.[19]  Align attempts to distinguish CNET Networks by noting that, unlike the catalog there, the 3D digital model is not itself bought and sold as a final product.  Align Mem. at 11; Align Reply at 13.  This argument appears to be irrelevant to the § 271(g) analysis, because the statute does not require a "product" to be sold at all, as it explicitly provides for liability if the product at issue is sold or imported or used.  Further, under Align's proposed construction, any patented process that produced a product only used as a component in another product could never give rise to a § 271(g) claim.  Such a reading would make the exception contained in § 271(g)(2) superfluous: if no component could be a "product," then there would be need to have an explicit exception for products that become "trivial and nonessential components of another product."  "[T]he words of a statute are not to be rendered superfluous if such a construction can be avoided." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1382 (Fed. Cir. 2008), citing Walther v. Sec'y of Health & Human Servs., 485 F.3d 1146, 1150 (Fed. Cir. 2007).

Accordingly, the Court finds that Align has failed to establish that the digital 3D model is not a "product made" by a process patented in the United States.

_____

[19]  Align also argues that, unlike the catalog, there is no tangible analog to the digital model of the teeth.  However, the CNET court's point in comparing the electronic catalog to a paper one was merely that the file was not mere "abstract information."  Moreover, as Ormco points out, a 3D digital model of teeth is similar to a plaster or plastic model of teeth.  Ormco Opp'n at 14.

### 2.    Does the 3D Digital Model fall under the "material change" or "trivial and nonessential component" exceptions?

In support of its motion for summary judgment, Align identifies several processes subsequent to the "Painting Crowns" step that it argues lead to a material change. While some of these occur after the post-Treat 3D digital model is uploaded to the United States, and after the 3D digital model is itself reviewed by the patient's treating orthodontist in the United States, the parties dispute whether any of these processes cause "material" change. Ormco has pointed to expert testimony stating that it contends shows there cannot be  "material change" in the "shelling" and manufacturing stages in Mexico. OSGI ¶¶ 54, 58; OAUF ¶ 10; Crueger Decl., Ex. K at 84-85; Rekow Decl. ¶¶ 18, 22.  Align counters by pointing to language in expert testimony suggesting that material change *must* occur at those stages. Align Reply at 11; Rekow Decl. ¶¶ 18, 22; Reply Kim Decl., Ex. B at 205:11-206:18.   This dispute between experts is a genuine factual one, and thus, cannot be resolved on a motion for summary judgment.

Since Align has failed to establish either that the digital 3D model is not a "product  made" by a process patented in the United States or that the product subsequently undergoes a "material change," its motion for summary judgment as to Ormco's § 271(g) claim must be denied.

## V.    CONCLUSION

For the foregoing reasons, Ormco's motion for summary judgment is GRANTED as to literal infringement of claims 37, 38, 39, 40, and 69 and infringement under § 271(f)(2). Ormco's motion is DENIED as to its § 271(a) and § 271(f)(1)

claims.   Align's motion for summary judgment is GRANTED as to Ormco's § 271(a) claims relating to Align's commercial processes and Ormco's § 271(f)(1) claim and DENIED in all other aspects.

IT IS SO ORDERED.

1    Date:  February 23, 2009

2    _____
3    CHRISTINA A. SNYDER
     UNITED STATES DISTRICT JUDGE
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28